The State v. Town.

---

75]                    *THE STATE v. TOWN.

Murder, &c.—malice—constructive presence—jury—refreshment—physician—verdict—new trial.

Murder and manslaughter defined.
All homicide is in law presumed to be with malice, and the circumstances of explanation must be shown by the prisoner to reduce the case to manslaughter, under our law,
Malice is an evil design, the influence of a wicked, depraved, and malignant heart.
Express malice is when one with a sedate mind and settled design kills another—the design is evidenced by external circumstances, discovering the inward intention, as by former grudges, &c.
Implied in law, when the act done is of unusual enormity or cruelty, or without great provocation, as by poison, the killing a public officer in the discharge of his duty, &c.
Deliberate and premeditated malice is when the act done has been coolly reflected and determined upon before it is done; and if the passion has been excited, and time has elapsed for it to cool and subside, it is for the jury to say if the act was of deliberate and malicious artifice, or resulted from heated temper.
One who keeps guard while others act, thus assisting them, is in the eyes of the law present, and responsible as if actually present.
The jury in a capital case may in court be advised upon matters of law; ask a question of a witness before examined; may have refreshment by leave of the court, and a sick one may be examined by a physician.
If the jury do not in a murder case specify in their verdict whether they find the prisoner guilty of murder in the first or second degree, or of manslaughter, the court will refuse to pass sentence, and award a new trial, even if not asked for.

The State *v.* Town.

· MURDER. The prisoner was indicted for the murder of Adonijah Morris on the 10th of April, 1831, under the act of assembly, 22 *O. L.* 158. In selecting the jury, the defendant made sixteen peremptory challenges. The prosecuting attorney was allowed to inquire of a juror if he had scruples against punishing with death, for murder. The jury were then sworn.

It was proved on the trial that Morris was found in the morning of the 10th April, 1831, hanging by the neck, with a skein of yarn tied to a loom. The body was stiff and the limbs contracted. He swung clear of the floor, but if his limbs had been straight, he would not have swung clear. The yarn round the neck had left a slight discoloration; but there was no extravasated blood. His countenance was natural. The appearances of the brain, &c., as testified to by the physicians, were those of a man suffocated. The neck was not dislocated. The deceased and his wife had sometimes quarrelled. He was in embarrassed circumstances, and had conveyed his property to the prisoner to secure him and keep it from creditors. He and his wife had lived in the house with the prisoner. The deceased and the prisoner had quarrelled. Improper connection had taken place between the wife of the deceased and the prisoner. The day before the death, the prisoner had been drinking. He went to the house of the deceased before it was quite dark, and on his way threatened that he was going up to give the deceased his destiny; he returned shortly after, and said he had given him his destiny, and requested the people not to go there. The prisoner was in conversation with the wife of the deceased just *before dark in [76 the road near his own house, and she and her son slept at the prisoner's house all night, leaving the deceased at home alone. Early in the morning, the wife and son were seen about the door of their own house, and called a neighboring woman to go in with them, as they said they were afraid the old man would kill himself. They went in, and found the old man hanging by the neck as described. They said they found him at home in the morning, and while breakfast was getting, he got angry and drove them off, threatening them, and threatening to kill himself. That they then went out for help, were gone a few minutes, when they called the woman and returned into the house and found him as stated. Shortly after this, the wife and her son disappeared. Soon after the death, the prisoner separated from his own wife, went into the state of New York, and met the wife of the deceased, and they have lived together since as man and wife, having removed into and settled in Geauga county. He called Mrs. Morris his wife, and said

The State v. Town.

his own wife was dead a year, and that Morris died down the Musk-ingum. Evidence was given of his contradictory stories. The wife and the son both gave evidence not necessary to be detailed.

*Sturges*, prosecuting attorney, and *Coffinberry*, for the state.

*Bedford, Hopkins*, and *O. Parish* for the prisoner.

WRIGHT, J., in giving the cause to the jury, adverted to the im-portance of the case, and instructed them in their duty. He read the three first sections of the crimes act (29 *O. L.* 158), and de-fined—

1. *Murder in the first* degree to be, when one purposely, of de-liberate and premeditated malice, kills another.

2. *Murder in the second* degree to be, the intentional killing with malice, where the *malice*, or evil disposition of mind, operates suddenly upon some recent impulse, and had not been premeditated or deliberated upon.

3. *Manslaughter.* The unintentional killing, *without malice*, where the slayer is in the commission of some unlawful act, or the intentional killing, upon a sudden quarrel.

All homicide, he said, was in law presumed to be malicious, and it lay upon the accused to adduce the circumstances of mitigation or excuse he relied upon, to reduce it from the second degree of murder to manslaughter. Malice he defined to be an evil design, the influence of a wicked, depraved, malignant heart, bent on mischief. It was of two kinds, *express*, or *implied in law*. Express, where one with a sedate deliberate mind and formed design, kills another, and the design is evinced by external circumstances, discovering the inward intention; as, by lying in wait, antecedent menaces, for-mer grudges, concerted schemes to do bodily harm. Implied, or by construction of law, when death ensues from some unusual act of aggression, or enormous act of cruelty, though there be no previous grudge or enmity, as the killing an officer in the discharge of his duty, or the administration of poison, or killing without any or con-siderable provocation; because, no person, unless possessed of an abandoned heart, would deprive a fellow-being of life, upon slight or without apparent cause.

The deliberate purpose to kill, necessary to constitute the crime of murder in the first degree, is that deliberation used in the forma-tion of the evil design, before the aggressive act is actually commit-ted. Where the purpose is coolly and deliberately formed, and time has elapsed since the receipt of the provocation, if any, for passion

to subside, it is a question for the jury to decide, whether the slayer was influenced by heated passion, or by a deliberate and malicious artifice, to effect the destruction of his subject.

There is no evidence in support of the third and fourth counts of the indictment, for killing with an ax, and stamping with the feet; and, upon those two counts you can acquit the prisoner at once. The first charge is for killing by strangling with yarn about the neck; the second, for killing by suffocation with a pillow. The death is a fact not disputed. If the jury is satisfied upon the evidence that he came to his death by strangling, or smothering, or through the application of yarn to his neck, or a pillow or other substance to his mouth and nostrils, by the prisoner alone, or by him in conjunction with any other person, he is responsible on this indictment. One may be present in the eye of the law, though not actually present: as, if several confederate to do a deed of death, and one keeps guard at the door, while the other inflicts the wound, the one on guard is present in legal contemplation participating in the act done, and is equally responsible with those actually present doing the act.

On this indictment, the jury should acquit altogether, or find the prisoner guilty of murder in the *first* or *second* degree, or of *manslaughter*, and should, under our law, express in their verdict which offence they find; 29 *O. L.* 142. They should only convict when convinced beyond a reasonable doubt of guilt. The doubt of any one of the jury, honestly entertained upon the evidence, should acquit the prisoner. [The judge explained the difference between positive and circumstantial evidence, and adverted to the circumstances relied upon on each side.]

*The jury retired at nine o'clock, P. M. At eleven o'clock they [78 sent for the court, and received instruction upon a point of law and again retired. At eight o'clock the next morning, they were allowed refreshment, and a physician was allowed to examine and prescribe for one of the jurors that was sick. At nine o'clock, they again appeared in court, and were instructed upon a question of law, and Killough, a witness, was re-examined, when they again retired. At half-past ten o'clock, they returned a verdict of guilty generally. They were polled at the instance of the defendant.

The prisoner's counsel were preparing affidavits to ground a motion for a new trial upon, when

THE COURT informed them that the verdict must be set aside; because it did not specifically find what offence they found the prisoner guilty of—whether of murder in the first or second degree,

79

or of manslaughter, which they were instructed to do, and is required by law; and because the jury had found the prisoner guilty upon the last counts without any evidence. New trial granted.

☞*At August term*, 1833, *Town was again tried before Judges* WRIGHT *and* WOOD, *with but slight variation in the evidence, and acquitted.*

Intent in manslaughter, dist; *Montgomery v. State*, 11 *O*. 424, 426. Verdict must specify degree of homicide; *Dick v. State*, 3 *O. S*. 89, 95; *Parks v. State*, 3 *O. S*. 101, 104.